In re CONDEMNATION OF LAND IN WEST PARK DISTRICT UNDER KANSAS CITY ORDINANCE NO. 37008 v. KATE BORUFF et al., Appellants.

In Banc, June 26, 1922.

1. **CONDEMNATION FOR PARK: Use as Soldier Memorial.** In a proceeding for the condemnation of land for a public park, the question whether a memorial is later to be erected therein is a matter to be determined by the city and outside the issues.

2. ———: **Evidence: Purchase Price Paid by Others.** The purchase price paid by others for land in the district to be condemned for park purposes, which was a part of the land to be condemned and which was contracted for about the time the proceedings were initiated, although the deeds were not exchanged until after the passage and publication of the condemnation ordinance, is competent on the question of the market value of similar tracts, and may be considered by the jury for what it is worth; and in this case the cautionary instruction so restricted the jury's consideration of such evidence as to safeguard appellants' rights. Land designated by an ordinance for condemnation is still on the open market, and the owner has the right to sell and the purchaser to buy, so long as the condemnation thereof is not perfected. [Distinguishing Metropolitan Street Ry. Co. v. Walsh, 197 Mo. 392.]

3. ———: ———: **Offer to Give Property to City: Res Gestae.** Testimony that the owner of property in the district sought to be condemned for park purposes offered to donate it to the city if it were used for a memorial for soldiers, said owner having later sold his said land and therefore not a party to the proceeding, is not competent on the question of the market value of similar land. The proceeding being one for the condemnation of land for park purposes, and no improper acts being charged to the city, and there being no showing of an effort on the part of the city to fix the market value by the transaction which resulted in the sale by said owner of his land to another defendant, whatever said owner may have previously said about his willingness to donate said lands is no part of the *res gestae*, but narrations wholly disconnected with the question of market value.

4. ———: **Trial: Begun at One Term: Concluded at Next: Stare Decisis.** In a proceeding for the condemnation of land for a city

park, involving 188 tracts, worth a million dollars, in relation to which the city charter provides that "the court may continue the proceedings from day to day or adjourn to a future day," a judgment is not void because the case was begun at one term of court and concluded at the next. Such a proceeding is not an ordinary civil case, and the universal rule in large condemnation proceedings has heretofore been that, under said charter provision, they may be begun at one term and concluded at the next, and even if such rule were wrong it has been so long adhered to and so many property rights have been acquired under it that it will not now be disturbed.

5. ———: Notice: Publication: In Non-Designated Paper: Appearance. Although the judges of the circuit court in Kansas City, in pursuance of the statute (Sec. 10495, R. S. 1919), had designated a certain newspaper as the one for the publication of legal notices, the publication of the notice of a condemnation proceeding in a paper doing the city printing and other than the one so designated will not be considered no publication, since the city charter provision requiring such notices to be published in the paper doing the city printing does not necessarily conflict with said statute or the Constitution, and it was ruled in State ex rel. v. Seehorn, 246 Mo. l. c. 557, that Kansas City may, by virtue of constitutional provisions, regulate purely local affairs in the matter of condemnation proceedings, and that ruling should now be considered conclusive. Besides, the appearance of land owners, either in person or by attorney, cures any lack of notice or defect in the service of process.

6. ———: Instructions: Expert Witnesses: False Swearing. The opinion of expert witnesses as to the market value of land brought into condemnation is merely advisory, and the fact that they widely differ in their opinions does not make error the refusal of an instruction telling the jury that if they believe any witness has wilfully sworn falsely to any material fact they are at liberty to disregard the entire testimony of such witness. Such an instruction has no proper application to opinion evidence which is merely advisory.

7. ———: ———: Graded Tracts: Comment. Evidence that given tracts of land brought into condemnation have been brought down to grade is properly admitted as tending to establish their value, but an instruction telling the jury to add to the value thereof a reasonable price as shown by the evidence for grading such tracts as compared with others not graded, should be refused, since it is a comment upon, and a specific direction to the jury to note, such evidence of grading and its cost in arriving at their verdict.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

AFFIRMED.

*Henry S. Conrad, Clarence S. Palmer, M. S. Garrard, Wilkinson, Wilkinson & Dabbs, Reinhardt & Schibsly, T. A. Milton, Ed. E. Aleshire, Omar E. Robinson* and *Conger Smith* for appellants.

(1) The prices at which an owner whose land is under condemnation at the time sells the same is not competent evidence for the purpose of establishing the value of the lands taken by the condemnation proceeding. Metropolitan Street Railway Co. v. Walsh, 197 Mo. 392; McNaughton v. Commonwealth, 220 Mass. 550. (2) If a trial is unfinished at the end of one term of a circuit court and is continued into the succeeding term of the same court, in the same county, and then proceeded with to the end of the trial, the proceedings in the latter term are invalid and the judgment rendered therein should be reversed. Neal v. Kansas City Railways Co., 199 Mo. App. 498. (3) The order of publication having been made in a newspaper called the Daily Record which was not the newspaper to which the board consisting of the circuit judges of Jackson County, had in pursuance of the state statutes given the contract for printing and publishing legal notices and which was at the time the only newspaper in which said order of publication could be legally published, there was in effect no publication of said order. Sec. 10405, R. S. 1919. (4) The court erred in refusing to give instruction marked "Aleshire 1." Either witnesses who testified that Tract 67 was worth $65 a foot and parties who testified that it was worth $250 a foot, testified falsely, and it certainly was a material issue. (5) The court erred in refusing to give instruction marked "Aleshire 2." (6) While the values fixed by the jury are questions of fact, yet when the evidence is so overwhelmingly in opposition

to the finding of the jury, it is not improper to say that the finding was against the evidence and against the weight of the evidence. The evidence shows conclusively that the jury disregarded claimants' evidence. There can be no question but what Instruction 2 was fair and one that should have been given to the jury. Especially is this true in view of answers by the city's principal witness, Herbert V. Jones. This indicates that the witness paid no attention to improvements of any kind or expenses incurred by the claimants. "Q. Does improving property and putting in sewers, sidewalks, curbing in your streets and all those things have anything to do with fixing the value of property? A. Not necessarily. Q. And does it make any difference in value as to whether it is on grade or not, a lot? A. Very little at that point." All public improvements to property in the city is paid for by the owner and it is on the theory that sewers, sidewalks, curbs and street improvements add to the value of the property, though Mr. Jones thinks it makes no difference. "Q. Now, suppose there had been 2000 yards taken off of Tract 67, would that enhance the value any for that lot as against Tract 68? A. I don't think that would make any perceptible difference in the value of that class of property." This same witness, however, says it might cost $1.50 a yard or something like that, to remove the dirt from this Tract 67. These witnesses were employees of the city for the purpose of making valuation of this property and testifying in court. (7) Prior to the trial Mr. McElroy had control and was controlling the Mazda Realty Company, and had purchased through a committee of some sort about 46 per cent of all of the property to be condemned. Mr. McElroy also turns out to be city's witness number 3 to bear the prices down. His company (Mazda Realty Co.) owned a large proportion of condemned property, though he was so generous he did not seem to want any more than it cost him. In other words he bought it for the Liberty Memorial Committee. That McElroy, Sears and Jones

worked together we only need to refer to one question: "Q. Now, Mr. Sears, in fixing the price of the property owned by the Mazda Realty Company, did you discuss the matter any with Mr. McElroy? A. Oh, I got what information Mr. McElroy had available." That means undoubtedly that Mr. McElroy furnished Jones and Sears the cost of every piece of property they had bought and they doubtless had a list of all the prices, and fixed the values in accordance with what McElroy had paid for what they say was similar property. Following the above question and answer: "Q. You got the information from Mr. McElroy as to what it cost him, did you? A. I got information from him like I did any one else. Q. Now you talked with Mr. McElroy about what this property cost him, didn't you? A. Yes, I got what information Mr. McElroy had. Q. But you knew he purchased it for the Memorial Association, didn't you?" THE COURT: It doesn't make any difference whom he bought it for—all right to inquire about price —sustained as to whom he bought it for. "Q. And you knew what it cost him, didn't you? A. Yes, sir, I had the information he had." It is clearly shown that the witness Sears knew all about the McElroy purchase and says that he went to him to find out what it cost him. If Mr. Sears had gone to Dr. Brooks, Hussy, or Parker, he could have found out that their property cost them three times more than he was allowing them for it. The city's witnesses were not interested in what property cost other people but wanted to know what McElroy had paid for the property he had bought, in fact, for the Memorial Association.

E. M Harber and Benj. M. Powers for respondent.

(1) The evidence concerning sales to the Mazda Realty Co. was properly admitted. (a) Evidence of sales of similar property constitutes the best standard of value in condemnation cases. Met. St. Ry. Co. v. Walsh, 197 Mo. 392, 403; Railway Co. v. Clark, 121 Mo.

169; Markowitz v. Kansas City, 125 Mo. 485; In re Forsythe Blvd., 127 Mo. 417. (b) The sales to the Mazda Realty Co. were not the kind of evidence condemned by Met. St. Ry. Co. v. Walsh, 197 Mo. 392. (c) The evidence of the Mazda sales was offered by the owners of the property thus purchased as a part of their case against the city, and it would have been error to exclude it since appellants had previously been allowed to testify to prices they paid for their own property. (d) The introduction of evidence is not reversible error unless appellants objected thereto at the time it was offered, and appellants cannot rely upon an objection other than the one they made at the time evidence was offered. Williams v. Dittenhoefer, 188 Mo. 134; Russell v. Glasser, 93 Mo. 353; Coughlin v. Haenssler, 50 Mo. 126. (e) Each appellant can rely only upon the objections he himself made and cannot take advantage of the objections raised by another party. Kansas City v. Woerishoeffer, 249 Mo. 23. (f) An appellant cannot take advantage of an error which he himself has invited in the trial of a case. 2 Elliott on Evid., sec. 889; Holmes v. Braidwood, 82 Mo. 610; Christian v. Ins. Co., 143 Mo. 460; Met. St. Ry. Co. v. Walsh, 197 Mo. 412; White v. Railroad, 250 Mo. 488. (2) The offer of appellants to prove an alleged statement of Walter S. Dickey was properly refused. The evidence was hearsay and not *res gestae.* State ex rel. Bankers Life Ins. Co. v. Reynolds, 277 Mo. 14. (3) There was no error in receiving the verdict or report of commissioners at a term subsequent to that of trial. (a) A condemnation case, under the Kansas City Charter, is not a jury trial and the verdict or report of commissioners may be made at a term subsequent to that at which the case is tried. L. & F. Plank Road v. Pickett, 25 Mo. 535; In re Grading Independence & Westport Road, 238 Mo. 330; St. Louis v. Schuttenberg, 212 S. W. 864; Kansas City Charter 1909, art. 13, secs. 12 to 20; St. Joseph v. Truckenmiller, 183 Mo. 14; Leavenworth T. & B. Co. v. Atchison, 137 Mo. 229. (b) The established procedure, under the

Kansas City Charter, permits a verdict to be returned at a term subsequent to that of trial, and property rights involving millions of dollars have vested in reliance upon it. It should not be lightly disturbed. State ex rel. Graham v. Seehorn, 246 Mo. 560. Some important cases where this was done are reported as follows: Kansas City v. Bacon, 157 Mo. 450; Kansas City v. Mastin, 169 Mo. 80; Kansas City v. Woershoeffer, 249 Mo. 1; Kansas City v. Morris, 276 Mo. 158. (4) The order of publication was properly published in the Daily Record, which was the newspaper doing the city printing, and hence designated by the charter for publications in condemnation cases. In condemnation proceedings by Kansas City the procedure fixed by the city charter prevails as against the general procedure fixed by state statutes. Kansas City v. Field, 99 Mo. 352; Kansas City v. Scarritt, 127 Mo. 642; Kansas City v. Ward, 134 Mo. 172; Kansas City v. Marsh Oil Co., 140 Mo. 458; Kansas City v. Mastin, 169 Mo. 80; In re Independence & Westport Road, 238 Mo. 331; State ex rel. v. Seehorn, 246 Mo. 557.

GRAVES, J.—With slight omissions and statements the counsel for appellants have fairly outlined the case, and it is as follows:

This is a proceeding in condemnation, whereby the city of Kansas City, Missouri, seeks to condemn under its charter powers certain lands within its limits, as an enlargement and addition to Penn Valley Park.

In a general way, the area condemned consists of all the tracts of ground situated within the following described limits:

The west line of Main Street on the east; the east line of Central Street on the west; the south line of Twenty-fifth Street on the north and Penn Valley Park on the south.

These appellants are all owners of land taken by this proceeding. The ordinance which is the basis of the proceeding was approved by the city council on the

11th day of February, 1920, pursuant to a resolution which the Board of Park Commissioners had adopted prior thereto. The court proceeding was inaugurated by the filing in the office of the Clerk of the Circuit Court of Jackson County, Kansas City, Missouri, a certified copy of the ordinance on the 4th day of March, 1920.

On the same day that the certified copy was filed the court made its order of publication, which by its terms was returnable on the 5th day of April, 1920. After various preliminary motions and orders, a jury of freeholders was chosen on the 24th day of April, 1920, before whom the cause proceeded to trial on the 7th day of June, 1920.

The verdict of the jury assessing the damages for the property taken and spreading the benefits was returned on the 11th day of October, 1920.

The property owned by these appellants and the amounts allowed by the jury therefor were as follows:

Joseph A. Guthrie, Owner:

Tracts 12 and 13, being 40 feet at the southwest corner of 26th and Main Streets, ........................... $4,026.00

Eva J. DeObert, Owner:

Tracts 14 and 15, being 25.55 feet adjoining the above on the south, .. $2,680.00

Austin Real Est. & Agency Co., Owner:

Tracts 18 and 19, being lots 37 and 38 in Bouton's Second Addition, ........ $7,500.00

Wm. S. and J. E. Buchanan, Owners:

Tracts 20, 21 and 22 being lots 39, 40 and part of lot 41, in Bouton's Second Addition, ........................... $7,906.50

Ida C. Robinson, Owner:

Tracts 23, 24 and 25 and 26, being Lots 42 and 43 and part of Lot 41, and part of Lot 44, in Bouton's Second Addition $14,837.40

Edwin Austin, Owner:

Being parts of Lots 46 and 47, in Bouton's Second Addition, .............. $9,900.00

John M. Surface, Owner:
    Tract 54, being Lot 5, Block 5, Sheidley
    Park, ............................ $3,750.00
W. W. Brooks, Owner:
    Tract 67, Being Lot 19, Block 3, Sheid-
    ley Park, ......................... $4,000.00
Margaret Keith Hastings, Owner:
    Tracts 99 and 100, being Lots 1 and 2,
    Block 6, Sheidley Park, ............. $9,000.00
John G. Parker, Owner:
    Tracts 101, 102, being Lots 3 and 4,
    Block 6, Sheidley Park, ............. $8,000.00
James E. Burke, Owner:
    Tract 105, being Lot 7, Block 6, Sheid-
    ley Park, ......................... $6,000.00
Julius and Ada Von Briesen, Owners:
    Tract 123, being north 35 feet, of Lot
    36, Block 7, Sheidley Park, .......... $5,000.00
Theresa J. Jagodnigg, Owner:
    Tracts 137 to 141 inclusive, being Lots
    1, 2, 3, 4, and 5, Block 2, Sheidley
    Park, ............................. $12,500.00
August T. Fromwell, Owner:
    Tracts 155 and 156, being parts of Lots
    18 and 19 in Bouton's Second Addition,
    Sheidley Park, .................... $1,950.00
Christian Schock, Owner:
    Tracts 159 and 160, being Lots 21 and
    22, in Block 2, Sheidley Park, ...... $4,500.00
Asa E. Field, Owner:
    Tracts 120, 121 and 122, being Lots 25
    26 and 27, Block 2, Sheidley Park, .. $20,500.00

                                        $122,049.90

Motions for a new trial were duly filed by each of the appellants, and the same were on the 20th day of November, 1920, by the court overruled, and the verdict of the jury on said date was by the court approved and judgment was entered accordingly.

These appellants by appropriate proceedings have prosecuted this appeal from said judgment. Other pertinent facts will be mentioned in the argument.

It may be added that the testimóny tended to show and we feel warranted in saying that it was broadly conceded at the trial that the condemned area was to be used as a site for what is commonly known as the Liberty Memorial. In this connection the motion of the respondent seeking to advance this case upon the docket of the court, wherein it is so stated, is referred to.

The latter paragraph of this statement is the one in question.

There were 188 tracts or parcels condemned, and these appellants represent some 31 of that number. The lands condemned consisted of about twenty-five acres of very rough land, not specially fitted for business or residence property. It lies near the present Union Station, and much of it was bought up by speculators about the time the station was located. They perhaps overpaid in their anxiety to speculate.

Appellants make the following assignments of error in their brief:

"1. The court committed error in admitting evidence offered, over the objection of these appellants, by the claimant Mazda Realty Company, as to the prices paid by said Mazda Realty Company for lands purchased by it after the condemnation proceedings had begun, which lands were also at the time under condemnation by this proceeding.

"2. The court erred in overruling the offer made by the appellants to prove that Mr. Walter S. Dickey had publicly announced that he would turn over his property in the condemned district for memorial purposes at any price the Memorial Committee would fix for it.

"3. The court erred in that after this cause was submitted to the jury at the May term, 1920, of said court, to-wit, on the 14th day of June, 1920, it con-

tinued said cause for further proceedings until the 1st day of the September term, 1920, to-wit, September 13, 1920, and proceeded further with the trial of said cause at said September term.

"4. The order of publication was not published in the manner required by law.

"5. The court erred in overruling the motions for new trial filed in this cause by each of the appellants herein, in which all of the above assignments of error were duly made, and to the overruling of which appellants duly excepted.

"6. The order of publication having been made in a newspaper called the Daily Record, which was not the newspaper to which the board consisting of the circuit judges of Jackson County, Kansas City, Missouri, had in pursuance of the state statutes *given* the contract for printing and publishing legal notices and which was at the time the only newspaper in which said order of publication could be legally published, there was in effect no publication of said order."

Two of the appellants (Brooks and Parker) add the following other assignments:

"1st. The court erred in refusing to give instruction number 1 and marked 'Aleshire 1.'

"2nd. The court erred in refusing to give instruction marked 'Aleshire number 2.'

"3rd. The verdict of the jury was against the evidence and against the weight of the evidence and conclusively showed claimants' property to be worth three times the amount so allowed by the jury, and amounts to confiscation of the property."

This suffices to outline the case.

I. This is a straight proceeding for the condemnation of lands for a public park. There is a hint in the record that a memorial was to be erected thereon.

Erection of Memorial.

Suffice it to say that such question cannot be seriously involved here, because this is, as stated supra, an action to condemn land

for park purposes instituted by the city. What the city may later place in this park is a matter to be determined by the city. Of course, its conduct of the park must be within legal bounds. This record is purely one of condemnation for a public purpose.

The first real question in the case is the alleged error in the admission of evidence. The Mazda Realty Company bought up a number of tracts in this proposed park. It is clear that a portion, Purchase Price if not all, was contracted for prior to Paid for Other the passage of the ordinance. Some of Condemned Land. it may have been contracted for after its passage. The deeds came mostly after the passage of the ordinance directing the condemnation of the property. Evidence was admitted (put in by the Mazda Realty Co.) as to what said company had paid for the several tracts which it bought. One or two of these appellants made the specific objection that the evidence was incompetent, because the purchases were made after the condemnation ordinance was made public. This objection was lodged specifically as against Tract No. 10, the purchase of which may have been made by the Mazda Company, after the passage and publicity of the ordinance. The objection was based upon the theory that the land was no longer upon the open market. The theory of the objection is wrong. The land was upon the open market. The owner had the right to sell and the purchaser the right to buy. The condemnation may or may not have been perfected. The circumstances were all before the jury, and the jury had the right to consider the price, along with the other circumstances in determining what value it should fix under the law.

Much stress is placed upon the case of Metropolitan St. Ry. Co. v. Walsh, 197 Mo. 392. That case rules that where the party seeking condemnation purchased a part of the property desired, the price which it paid was not proper evidence, because of reasons fully stated by Fox, J., in that case. In this case the party seeking condemnation is Kansas City, not the Mazda Realty Com-

pany. In the Walsh Case, supra, the party seeking condemnation was the railroad company, which had made purchases of parts of the property which it desired for the public use. The rule in Walsh's Case is a correct rule, but has no application to this case. A reading of the reasoning of that case will suffice. The evidence was admissible for what it was worth. The court went far toward protecting the property owners by instruction numbered 12, which reads:

"The court instructs the jury that evidence of particular sales of lands in the tract being condemned do not necessarily, alone, establish the reasonable market value of the other lands being condemned, nor are such sales necessarily binding upon the jury in fixing the reasonable market value of such other lands, but such sales are only entitled to such weight, if any, as the jury, with a view to all the evidence in the case, may choose to attach to such sales, and if you believe from the evidence that any such particular sales, if any, may have been a sacrifice occasioned by necessity, or may have been the result of caprice, or folly, or may have been made by reason of a combination between purchasers and sellers for the express purpose of being later used as evidence for fixing a false standard of value on such other lands, then you may if you so choose with a view to all the evidence in the case, disregard evidence of such sales, if any, as fixing proper standards of reasonable market value of the other property being condemned, and you may give the evidence of such sales, if any, such weight, if any, as you deem proper with a view to all the evidence in the case."

We are not saying that this cautionary instruction would be absolutely required in the general run of cases of this character, but in view of the peculiar facts of this case it at least gave to defendants all to which they were entitled.

Upon the whole this evidence was (1) properly admitted, and (2) certainly properly safe-guarded. The general rule is that prices paid for the property in the

same district is proper evidence for the consideration
of the jury.

II.    There is even less substance in the second as-
signment of error than in the first.  H. F. McElroy was
the treasurer of the Mazda Realty Company.  Whilst he
was on the witness stand there was several
questions asked him with reference to the
connection of Mr. Walter S. Dickey with
the War Memorial Committee, and his
general interest in seeing this property acquired in the
interest of the Memorial to the Soldiers of the World
War, as we gather it.  There were some adverse rulings,
and Mr. Brown, then counsel for some defendant or
defendants, but not of counsel now, made an offer of
testimony as follows:

Donation of
Land: Res
Gestae.

"MR. BROWN (continuing):    That Walter S. Dickey
is a prominent member of this Memorial Committee;
that he has taken an active interest in efforts to acquire
this · property for this purpose; that he has stated
publicly, and has been quoted in the press as stating,
that he was willing to turn all the properties that he
controlled, either himself personally or through his cor-
porations, over to this committee, at whatever price they
should fix for it.    That he has made the statement that
he was willing to donate it to the Park Board outright
as a public gift if they so chose to receive it, and that
instead of saying that Mr. Dickey has not any connection
with the Mazda Realty Company, had all these prop-
erties that he owned transferred to the Mazda Realty
Company, not as representing actual purchases between
a bona-fide purchaser and a bona-fide seller, and not for
their real value as well known by him and the purchaser,
but for the purpose of creating false and fictitious
standards of value in advance to be used as evidence
in this case for the purpose of causing them to be used
as standards of value for other people's property.
Now, we submit that this line of questions are material
to this inquiry.

"The Court: Mr. Brown, a part of it would be competent if you offer it, but I cannot segregate it or separate it. What he may have said, or what the public press quoted him as saying, things of that kind, is wholly outside of the question involved here. But if he turned his property over to them without receiving anything, as a matter of public spirit or citizenship, something of that kind, or some fraud connected with it, I'll let you bring it out, but you have got so much included in your offer that I cannot separate it.

"Mr. Park: I object to the offer because too complex, embodies incompetent matter with competent.

"The Court: Objection sustained.

"To which action and ruling of the court counsel for said claimants then and there at the time duly excepted.

"Mr. Brown: We asked a series of questions and the one where they made objections the court has excluded.

"The Court: The objection sustained to the offer made; it embodies some that I'll let him go into, but others that I cannot. Sustained.

"To which action and ruling of the court said claimants then and there at the time duly excepted.

"Q. I will ask you, Mr. McElroy, if Mr. Dickey did not state to you and you have not heard him state to this Memorial Committee that all his holdings—

"Mr. Powers: I object to anything that he stated to the Memorial Committee.

"The Court: Ask him about the statement.

"Q. That he was willing to turn over to the Memorial Committee or any person they might designate, at whatever price they chose to take, or words to that effect?

"Mr. Powers: I object to that for the reason it is immaterial and hearsay.

"The Court: Sustained."

This, they now urge, was a part of the *res gestae*, and should have been admitted. Mr. Dickey is not a

party to this suit. Some of his holdings, held by corporations of his, and perhaps some of his personal interests, were sold to the Mazda Company, at prices agreed upon between the parties, but this does not effect Kansas City, the plaintiff in this condemnation proceeding. No improper acts are charged to the city. No effect upon the part of the city to fix a market value by the Mazda Company transactions is shown. The term *res gestae* has been succinctly defined by FARIS, J., in State ex rel. Bankers Life Ins. Co. v. Reynolds, 277 Mo. 1. c. 24, thus:

"The *res gestae* may be defined as those circumstances which are the automatic and undisguised incidents of a particular litigated act and which are admissible when illustrative of such act, indeed must be in contemplation of law a part of the act itself. Narratives unconnected with the principal facts are universally rejected."

Mr. Dickey was not acting for Kansas City, but was evidently on this Memorial Committee or Board. His statements, if made, could not constitute a part of the litigated act here involved. The doctrine of *res gestae* does not apply. It must be kept in mind that the litigated act is the right of Kansas City to condemn this property. That right is practically undisputed, and the only real dispute is the value to be paid. The city was no party to any of these Mazda Company deals. Mr. Dickey had the right to give his property to the city had he so desired. He did not, however, do this, but did deal with the Mazda Company. We think the trial court right in its ruling, and permitted defendants to go as far as was proper, if not further, into the question of an effort to fix prices by reason of the Mazda Company's deal in this property. This contention is ruled against appellants.

III. It is next contended that the award and judgment is void because the case was begun in one term of court and finally concluded at the next term. The trial,

they urge, was concluded on June 14, 1920, the 27th day of the May term, it having begun on June 7th. The court thereupon directed the jury to return into court its verdict upon the first day of the September term of the court following. There were nearly a million dollars' worth of awards made in this case, and 188 tracts of land to be considered.

**Begun at One Term: Concluded at Next.**

We are cited to Neal v. Kansas City Rys. Co., 199 Mo. App. 498, as authority for the proposition that a civil case must be concluded during the term. We have no fault to find with that case. The case at bar is not an ordinary civil case. The jury is not the ordinary common law jury. They do not perform the ordinary functions of a jury in the ordinary civil case. [Louisiana & Frankford Plank Road Co. v. Pickett, 25 Mo. 535.] But in this case the Kansas City charter, which is the guide-book for proceedings of this kind (Art. 13, sec. 13), provides: "and the court may continue the proceedings from day to day or adjourn to a future day." Under the provisions of the charter a great number of cases have been tried as this case was tried. That is, that trial was begun at one term and concluded at another. This seems to have been the universal custom in large condemnation proceedings. [Kansas City v. Bacon, 157 Mo. 450; Kansas City v. Mastin, 169 Mo. 80; Kansas City v. Woerishoeffer, 249 Mo. 1; Kansas City v. Morris, 276 Mo. 158.]

Great property rights have been adjudicated and fixed under this construction of the Kansas City Charter. In fact the cases heretofore never challenged the correctness of this construction of the charter. Even if the construction is wrong, VALLIANT, C. J., expressed the views of this court in State ex rel. v. Graham, 246 Mo. l. c. 560:

"If the question of jurisdiction in the municipal court of cases of this kind were one of first impression I would concur in the dissenting opinion filed by my brother GRAVES. But on looking back over the cases

that have been decided by this court I have come to the conclusion that whilst the question has not been directly decided by this court, yet cases have been here in which the question might have been raised but was not, and the subject was passed over in silence, the jurisdiction apparently acquiesced in by the parties and not questioned by the court. In its first charter adopted in 1889 by Kansas City under Section 16 of Article 9, there was created a mayor's court upon which was conferred jurisdiction in cases of this kind and which the Charter of 1909 now confers on the municipal court. Thus, for more than twenty years the city has acted on the assumption that it had authority to create such a court and confer on it such jurisdiction. In that period doubtless property rights have been acquired to a great extent and I believe it would now be unwise to declare that rights which have arisen out of the exercise of such jurisdiction by such courts cannot be upheld. For this reason I concur in the opinion of brother KENNISH in this case.''

This was the case involving the jurisdiction of the municipal court of Kansas City. The present writer dissented to that opinion, but the views of Chief Justice VALLIANT, above quoted, is the real thread of the majority view. He had, as will be seen, written a dissent, which the writer of this opinion adopted as his views of that case. But be this as it may, that case settles this question in the present case. The authority to proceed as the charter directs, which has been the practice for years, should not now be disturbed, even though it might have been questionable in the first instance. In St. Louis we have also recognized the rule in this class of cases. [St. Louis v. Schattenberg, 212 S. W. 864.] In this case the commissioners began their hearing on February 4th, and a condemnation judgment was not entered until January, 1917.

We do not want to be understood that the provisions of the Kansas City Charter allowing the trial court to continue the case from day to day or to a fixed

future day is violative of statutes or Constitution, but what we do rule is that the construction given it by the trial court has been so universally recognized that it should not be disturbed at this time. This contention is therefore ruled against the appellants.

IV. It is further argued, but with less vehemence, that there was no publication, because the notice was published in the Daily Record instead of the Out-West Review. The latter was the paper designated for legal publications by the circuit judges under Section 10405, Revised Statutes 1919. The former was the paper doing the city printing, and the charter provided that such notices as is here involved should be published in the paper doing the city printing. First, it may be said that the charter provision does not necessarily conflict with the State law, supra, nor the Constitution. [State ex rel. v. Seehorn, 246 Mo. l. c. 557, and the cases there cited.]

Publication of Notice:
In Wrong Newspaper.

The cases cited in this Seehorn Case are Kansas City cases, and go to the doctrine that by virtue of constitutional provisions Kansas City may by charter regulate purely local affairs in the matter of condemnation proceedings. To this the writer did not then agree to the extent that such city could erect a court in which such cases could be tried. Five members of this court held that it could. It is true that two of the five ruled reluctantly, and for a special reason assigned, yet it was so ruled. The doctrine announced in that case is conclusive here, and for like reasons.

There is another view to be taken that would be fatal to appellants, if true. If they appeared at the trial in person or by counsel then the want of 'due notice or service of process would be unavailing. Their appearance would cure defect of service. The record is not clear as to whether or not all of the appealing defendants appeared, but it is clear that many of them participated in the trial. As to these they are precluded from a claim

of want of service. But in view of what we have first said in this paragraph of the opinion, a discussion of this point is not really necessary. This contention is ruled against appellants.

V. Three of the defendants, represented by Mr. Aleshire, asked the court to give, and the court refused, the following instructions:

"1. The court instructs the jury that if they believe from the evidence that any witness has wilfully sworn falsely to any material fact in issue, then they are at liberty to disregard the entire testimony of such witness.

"2. The court instructs the jury that in ascertaining the value of the several tracts of land in controversy they should take into consideration the topography of the ground and where it has been partially or totally brought down to grade they should add to the value thereof, a reasonable price as shown by the evidence for grading such tract or tracts of land as compared with similar tracts not graded and give to the owners the benefits of such grading."

These three defendants excepted to the refusal of these instructions, and this is a matter urged as error here.

(a) Going to the first of the two refused instructions, it must be said that it was properly overruled. Whilst it might be said that such an instruction would be proper in certain cases (a matter not necessary here to discuss) yet it was not error to refuse

False Swearing: it in this case. The point made in this
Opinion Evidence. case is that the expert witnesses differed largely as to their judgments as to the value of the properties to be taken, or condemned. The testimony of these experts as to values was merely advisory. They were not testifying as to facts, but merely giving their opinion as experts. An instruction of this kind has no place under such circumstances. It is not every case which requires an instruction of this kind. In fact it is error

to give it in many cases.    [Schmidt v. St. Louis Rd. Co., 149 Mo. 269.]

The real test is whether or not in the trial court there is testimony upon given facts so conflicting as to produce the conviction that some of the witnesses have falsely sworn to the disputed facts.   Such is not the case here.   The conflicts are merely as to opinions upon value, which opinions of the experts as to value are merely advisory to the jury.   There was no error in refusing this first-named instruction.

(b)   Nor was there error in refusing the second instruction above set out.   Evidence that given tracts had been brought to the grade was properly admitted as tending to show its value, but this is no reason for a specific comment upon this testimony in an instruction. This comment upon the evidence is found in instruction numbered 2, supra, and rendered it bad.   It was the duty of the jury to determine the value of the property taken at the time and in the condition in which it then stood. If it had been graded it was proper for them to consider that fact in determining its value, but no specific direction should have been given, directing the jury specifically to note this evidence.   The court properly refused both of these instructions.

The foregoing covers the points made, and from it all, we conclude the judgment of the trial court was proper.   Instructions given properly directed the jury as to what it should consider in determining value.

The judgment *nisi* is right and should be and is affirmed.   *James T. Blair, C. J., Higbee, D. E. Blair, Elder* and *Walker, JJ.*, concur.